The UNITED STATES AUTO CLUB, INC., Defendant-Appellant,

v.

Wayne W. WOODWARD, Plaintiff-Appellee.

No. 2–283A35.

Court of Appeals of Indiana, Second District.

March 29, 1984.

Rehearing Denied May 17, 1984.

---

Henry C. Ryder, Roberts, Ryder, Rogers & Scism, Indianapolis, for defendant-appellant.

Belle T. Choate, Robert W. Hammerle, Indianapolis, for plaintiff-appellee.

RATLIFF, Judge, writing by designation.

## STATEMENT OF THE CASE

The United States Auto Club, Inc. (USAC) appeals a judgment in the amount of $10,000 entered against it and in favor of Wayne W. Woodward pursuant to a jury verdict. We reverse.

## FACTS

United States Auto Club, Inc. is a not-for-profit corporation which sanctions automobile races including the Indianapolis 500 mile race. Its function is to establish rules, license drivers, schedule races, and run races.

Woodward is the owner of a racing car which was entered in the 1979 Indianapolis 500. Woodward, by his own admission, is a "low budget" operator, and his car was an older car.

United States Auto Club, Inc. rules limit the amount of "boost" for turbo-charged

engines, which varies according to the type of engine, in order to maintain competitive equivalency among the various types of racing engines employed in the Indianapolis 500. The maximum allowable pressure or "boost" for Woodward's four cylinder Offenhauser engine in 1979 was 60 inches.[1] The engines are required to have a waste gate exhaust system which operates as a pressure relief valve in case the manifold pressure exceeds the maximum allowable pressure, in Woodward's case 60 inches.

Woodward's car, an older car, had been unable to attain satisfactory speeds for qualification for the 1979 race. According to Woodward's testimony, not only was his car unable to achieve suitable speed, it would not attain the maximum allowable boost of 60 inches. Rather, Woodward testified he was attaining only 56 inches of boost.

According to the rules, cars are allowed three qualification attempts for the 500 mile race. On Woodward's first attempt, his driver was able to attain speeds of between 179 and 180 miles per hour for two laps. Because these speeds obviously were too low to make the field,[2] Woodward called off this attempt. Woodward then welded shut the end of his waste gate exhaust pipe. Such action had the effect of overriding the manifold pressure relief valve, increasing manifold pressure, and increasing speed. This alteration was not discovered in the pre-qualification car inspection prior to Woodward's second attempt.[3] The second qualification attempt was successful and Woodward's car qualified at an average speed of 184.6 miles per hour. Inspection of the car following the second attempt revealed the welded shut exhaust pipe. As a result, USAC officials disallowed Woodward's qualification run. The next day Woodward made his third attempt finishing with an average speed of 171 miles per hour which was not sufficient to make the field for the race.

Woodward's first two qualification attempts, including the disallowed one, were on Saturday of the last weekend of qualifications. Because there was no definite rule on the minimum allowable diameter of exhaust pipes, on Saturday night, USAC adopted a supplemental rule setting a minimum internal diameter of 1.470 inches. As a result of a protest hearing, eleven cars which had been bumped from the race by faster cars, and which had a third attempt remaining, were allowed to make qualification runs with 1.470 inch pipes. Two successfully qualified and 35 cars started the race in 1979. Woodward was not one of these cars granted another attempt with a 1.470 pipe. He made his third run, achieved two laps in the 181 miles per hour range, developed engine trouble, slowed to the 160 range, and finished with an average of 171 which was too slow to make the race.

Woodward filed protest of the disallowance of his successful qualification attempt on May 19. It was denied on May 21st. Woodward then filed this action rather than appealing the denial of his protest in accordance with USAC's internal administrative procedures. The trial court ruled that "in the interests of equity," Woodward should be allowed until 6:00 P.M. on May 25, 1979,[4] to file an appeal. He did so, and USAC ruled on his appeal and denied it the next day.

In this action, Woodward originally sought both injunctive relief and damages. The injunction count was dismissed and the

1. Boost is defined in inches meaning the amount of pressure required to raise a column of mercury a stated number of inches.

2. The fastest 33 cars qualifying are those which are permitted to compete in the race.

3. It is not clear whether the inspection failed to discover the weld or whether Woodward changed exhaust pipes following the inspection but before the qualification attempt.

4. According to USAC rules, Woodward had until midnight the third day following denial of his protest to file an appeal. If his protest was denied on May 21st, his right to file an appeal had expired at midnight on Thursday, May 24th, which was prior to the time this court action was filed on Friday, May 25, 1979.

case proceeded to trial on the claim for damages which resulted in the verdict and judgment from which this appeal is taken. United States Auto Club, Inc. filed a motion to dismiss based upon Woodward's failure to exhaust internal administrative remedies and failure to perfect a proper appeal under those rules. This motion was denied. At the close of Woodward's evidence, and again at the close of all the evidence, USAC moved for judgment on the evidence based upon (1) Woodward's failure to exhaust administrative remedies, (2) his failure to post a proper bond as required by USAC rules, (3) his waiver of right to sue for damages pursuant to provisions of his entry, and (4) his release of USAC from any and all liability. These motions also were denied.

Further relevant facts are stated in our discussion of the issues.

### ISSUES

The issues raised in this appeal, which we have restated, are:

1. Was Woodward precluded from pursuing an action in the courts by reason of his failure to exhaust his internal administrative remedies under USAC rules and to comply with USAC's rules concerning an appeal bond?

2. Was Woodward precluded from recovering damages in the trial court by the provisions of the waiver of damages provision in his entry application and by his release?

### DISCUSSION AND DECISION

It is our opinion that Woodward's action for damages was barred both by his failure to exhaust internal administrative remedies and failure to comply with USAC rules prior to instituting this action, and by the terms of his waiver of the right to seek damages and his release of USAC. Although reversal may be predicated upon either issue, we will discuss and determine both of the issues presented.

*Issue One*

It is a general rule of administrative law that until a party exhausts available administrative remedies, courts have no jurisdiction to grant relief. *Northside Sanitary Landfill, Inc. v. Indiana Environmental Management Board,* (1984) Ind.App., 458 N.E.2d 277 (trans. pending); *Drake v. Indiana Department of Natural Resources,* (1983) Ind.App., 453 N.E.2d 293; *Evans v. Stanton,* (1981) Ind.App., 419 N.E.2d 253. This rule has been applied to private associations as well as governmental agencies. *The Supreme Council of the Order of Chosen Friends v. Forsinger,* (1890) 125 Ind. 52, 25 N.E. 129; *Randolph v. Leeman,* (1957) 129 Ind.App. 134, 146 N.E.2d 267, trans. den. (1958); 3 I.L.E., *Associations, Clubs, & Societies,* § 9 (1978); 6 Am.Jur.2d *Associations and Clubs* § 29 (1963). An exception to the rule exists where a member is suing an association for damages for wrongful expulsion. *Terrell v. Palomino Horse Breeders of America,* (1980) Ind.App., 414 N.E.2d 332;[5] 6 Am.Jur.2d *Associations and Clubs* § 42 (1963).

There are indeed other exceptions to the rule requiring exhaustion of administrative remedies. *Northside Sanitary Landfill.* One of these is futility. *Id.* In fact, Woodward argues he should not be held to the strict application of the rule requiring exhaustion of administrative remedies because such would have been futile. For reasons hereinafter stated, we do not agree.

Thus, we hold Woodward was required to follow those internal administrative procedures prescribed by USAC's rules. This is so because by the express language of his Official Entry Blank Wood-

---

**5.** *Terrell* contains language which is overbroad in that it does not expressly limit the exception to wrongful expulsion cases, 414 N.E.2d at 335. However, *Terrell* is a wrongful suspension case and relies upon 6 Am.Jur.2d *Association and Clubs* § 42 (1963) which specifically limits the exception to wrongful expulsion cases. Thus, we believe the *Terrell* holding is limited to actions for damages for wrongful expulsion or suspension.

ward accepted and agreed to be bound by USAC's rules in the following language:

"It is hereby understood and agreed by the undersigned that the car described above and driver named are to appear at the 63rd Annual International 500-Mile Sweepstakes as provided in the rules of the United States Auto Club, and the Approved Supplementary Regulations are hereby made a part of this contract."

Record at 320. Therefore, he was required, both by the terms of his contract and the general rule of law, to exhaust his internal administrative remedies under USAC rules prior to seeking relief from the courts. Indeed, the exhaustion requirement has been held applicable to USAC rules and procedures. *STP Corporation v. United States Auto Club, Inc.,* (S.D.Ind. 1968) 286 F.Supp. 146.

When Woodward's successful qualification run on Saturday, May 19th was disallowed, under USAC rules he was required to file a protest of that ruling with the Chief Steward. (USAC Rules, 1979, Part XI, pp. 56–57, Plaintiff's Exhibit # 1, Record at 324). Woodward did file a written protest, as required, which was heard by the Chief Steward on Monday, May 21st, and denied by him on that same date. Woodward was present when the denial of his protest was announced. The next step in the administrative procedure under USAC rules is to appeal the ruling on the protest to a three member court of appeals. The rules provide:

"12.2. Form of Appeal and Appeal Fee—An Appeal must be forwarded to the office of Director of Competition by midnight three days after the rendering of a penalty or other decision, ..."

(USAC Rules for 1979, Part XII, § 12.2, p. 58, Plaintiff's Exhibit # 1, Record at 324.)

Under the plain language of the rules, Woodward had until midnight on Thursday night to forward an appeal to the Director of Competition. He did not do so. Instead, on Friday, May 25th, he filed this action in court. The court heard his request for preliminary injunction the same day, and "in the interest of equity" granted Wood-

ward until 6:00 P.M. on May 25th to file his appeal and ordered USAC to rule on his appeal by noon on May 26, 1979. Record at 204–05. Following this direction, Woodward filed his appeal, the USAC appeal court held it and denied it on May 26, 1979.

We think it is clear Woodward instituted this action without first exhausting his internal administrative remedies under USAC rules by taking an appeal from the denial of his protest. This, he was required, both by the rules and applicable case law, to do. *STP Corporation; Northside Sanitary Landfill; Drake.* However well-intentioned, the trial court had no authority to alter USAC's rules and to grant Woodward additional time to file his appeal. Neither did USAC's hearing the late appeal under compulsion of court order constitute a waiver of USAC's right to insist upon exhaustion of the administrative remedies pursuant to its rules.

Woodward seeks to excuse his failure to exhaust his administrative remedies on the ground it would have been futile for him to have done so. It is true that an exception to the general rule requiring exhaustion of administrative remedies exists where the administrative remedy is inadequate or would be futile. *Ahles v. Orr,* (1983) Ind.App., 456 N.E.2d 425. Woodward does not develop his futility argument in his brief. However, to prevail on an assertion of futility, one must show that the administrative agency was powerless to effect a remedy or that it would have been impossible or fruitless and of no value under the circumstances. *Ahles. See also* 2 Am.Jur.2d *Administrative Law* § 605 (1962). Here, the record shows that all appeals from protest decisions were heard and decided prior to the scheduled running of the race. The administrative appeal court under USAC rules clearly had the power to decide Woodward's appeal. That they might have decided against him does not render that administrative remedy futile. *Northside Sanitary Landfill.* Thus, under the facts and circumstances of this case, Woodward has not shown resort to his administrative remedies would have

been futile thereby excusing him from the exhaustion requirement.

In addition, USAC's rules further provide:

"12.10 Bond—In no case shall a competitor appeal to or initiate any form of action in a civil court until he has exhausted his right to appeal under these Rules, and then only if he posts a cash bond or an approved corporate surety bond with the United States Auto Club in an approved amount (Five Thousand Dollars ($5,000) minimum) sufficient to cover the costs, including attorneys' fees, incurred by the Club in defending the action in the event the competitor is not successful in obtaining the relief requested."

Woodward's Exhibit #1, Record at 324.

The surety bond filed with USAC by Woodward was conditioned as follows:

"APPEAL BOND

We, the undersigned, as Principal and Surety, are held and firmly bound unto the defendant in the above-entitled cause in the penal sum of Five Thousand Dollars. The obligation of this bond is such that the Principal and Surety do hereby undertake that the Plaintiff shall prosecute this appeal with diligence and effect, and if so, this undertaking shall be null and void, otherwise to remain in full force and effect.

Dated this 25th day of May, 1979."

USAC's Exhibit # "E", Record at 468. The condition of Woodward's bond clearly is not that required by USAC's rules. This failure to comply with USAC's rules also is fatal to Woodward's court action.

*Issue Two*

The Supplementary Rules attached to the Official Entry Blank for the 1979 Indianapolis 500 mile race, which was signed by Woodward and submitted to the Indianapolis Motor Speedway,[6] provide:

"21. DISQUALIFICATION OR EXCLUSION—No entrant or driver or me-

chanic shall have any claim for damages, expenses or otherwise, against the Indianapolis Motor Speedway Corporation, or any of its officials, representatives, or assigns, or USAC or ACCUS–FIA or their officials, agents or representatives by reason of disqualification or exclusion of either car, driver or crew member."

Woodward's Exhibit # 2A, Record at 319.

 There is a principle of judicial noninterference in the affairs of voluntary associations which is important in this case. That rule has been stated in the following language:

"In the absence of fraud, illegality, or violation of a civil or property right, the courts will not interfere with the internal affairs of an association or club. Thus, in the absence of fraud or illegality, the courts have no power to pass upon the reasonableness of the acts of a voluntary association. When a property right or the right to make a living is involved, the courts are less reluctant to interfere."

3 I.L.E., *Associations, Clubs, & Societies,* § 9 (1978).

Judge Steckler applied this rule in *STP Corporation,* stating, at 286 F.Supp. 151:

"USAC is a sanctioning organization and has the right to legislate to perpetuate its existence and provide for competitive equivalency among all types of engines and no court has the right to step in and dictate to a sophisticated group of officials, duly elected, in a sanctioning organization which sanctions sports and in particular as in this instance a sport that is attended with grave hazards. Such rule making functions must be delegated to the powers of the governing body of that group and a court should interfere only if it finds that the powers were exercised in an unlawful, arbitrary or malicious fashion and in such a manner as to affect the property rights of

---

**6.** Indianapolis Motor Speedway is the owner of the racetrack facility. USAC sanctions the race and runs it under a contract with the speedway.

one who complains, none of which the Court finds to be so in this case.

. . . . .

A membership organization such as USAC as a voluntary organization or one of a social nature of sports organization must be left to legislate its own rules and its own guidelines for participation of its members for the purposes for which it was created so long as that legislation is not done in an unreasonable manner and without malice or intention to harm a single member or segment of membership. Such membership organizations have the right to adopt such rules to protect their very existence."

*STP Corporation* involved the rule making power of the organization. In that case, after the 1967 race, USAC adopted a rule which changed the specifications for turbine engines for the 1968 race in order to preserve competitive equivalency between turbine engines and piston engines. The plaintiffs argued they should be permitted to compete under 1967 specifications. The court refused to become involved in this controversy. *Cf. Koszela v. National Association of Stock Car Auto Racing* (2d Cir.1981) 646 F.2d 749. (Court said the principle of judicial non-interference not to be rigidly adhered to where the organization is primarily a business for profit and has a stranglehold on the activity such as NASCAR's complete dominance of stock car racing. However, the court upheld the NASCAR rule. The decisions of the association's race officials and interpretation of rules pertaining to race procedures for position setting would be considered final, and held the court could not review the correctness of the official track decisions in question.)[7]

█ We believe the judicial non-interference rule as enunciated and applied by

Judge Steckler in *STP Corporation* also should apply in this case. Absent some violation of a property right, or proof that the rule was applied in an arbitrary, discriminatory, or malicious manner, we believe adherence to the principle of judicial non-interference is a wise course of action here.

United States Auto Club, Inc.'s rules clearly prohibited any attempt to override the waste gate exhaust system. That rule provided that "if any device or method is found to defeat the established manifold pressure requirement, the qualification attempt will be disqualified, and one attempt charged to the car and a penalty of $5,000 will be assessed to the Chief Mechanic." Record at 438. This revision was adopted May 12, 1979, by bulletin issued that date to all entrants and chief mechanics. Woodward's action clearly violated that rule. His argument there was no specific rule forbidding welding shut the waste gate exhaust pipe is unavailing in the face of the clear language of the May 12th bulletin.

Woodward had no property right to participate in the 1979 race. Neither was his right to make a living defeated by USAC's action. He violated a clear provision of applicable rules with which, by his entry application, he agreed to comply. United States Auto Club, Inc. disqualified his qualification attempt as the penalty provided by its rules. Woodward was not arbitrarily, capriciously, unreasonably, or maliciously denied an opportunity to compete in the 1979 race. Under these circumstances there is nothing unreasonable in enforcing the provision of the entry blank denying a claim for damages for such disqualification.

Also, the entry blank signed by Woodward provided:

> decisions were made by track officials and under NASCAR rules the decisions of those officials in such matters were final. The court, despite its language concerning the non-applicability of the doctrine of judicial non-interference nevertheless refused to interfere and upheld both the NASCAR rule and the decisions of the track officials.

---

**7.** In one case, the plaintiff's car finished first but was reduced to a second place finish by the race officials because of a yellow flag violation occurring near the end of the race. In the other case, there was a miscounting of the number of laps completed by the second place car. A correction of the lap count put this car finishing first and ahead of the plaintiff's car. These

"LIABILITY—The entrant in signing this agreement and in consideration of the right to use the track under the conditions outlined and in consideration of the right to compete for prizes and trophies to be awarded elects to use said track at his or its own risk and hereby saves harmless said Indianapolis Motor Speedway Corporation, USAC and AC-CUS–FIA, together with their successors, assigns, officers, agents and employees, from all liability for injuries to person, property or reputation, suffered by him or any of his contractors or his employees as a result of the race or races or events contemplated under this Entry Blank, or practice or preparation therefore, and whether caused by any condition of the track or grounds or the conduct of any officer, agent, representative or employee of the Indianapolis Motor Speedway Corporation, USAC or AC-CUS–FIA engaged in any manner connected with the preparation for, supervision of, or conduct of said race."

Woodward's Exhibit # 2B, Record at 320; Joint Exhibits 1, 2, and 3, Record at 410, 411, 412. And the Official Application for Car Entrant's License and Registration, also executed by Woodward, contained this provision:

"WAIVER AND RELEASE OF LIABILITY AND INDEMNITY AGREEMENT. In consideration of this car entrant being granted a membership and/or competition license and in consideration of being permitted to enter competition events sanctioned by the United States Auto Club, Inc.:

1. I, for myself, my heirs, personal representatives and assigns, and for and on behalf of this car entrant, hereby release, discharge, and agree to hold harmless and indemnify the United States Auto Club, Inc., its successors and assigns, the race organizers presented sanctioned events, the owners and lessees of premises on which sanctioned events take place, the participants in sanctioned events, the owners, sponsors and manufacturers of all racing equipment upon the premises, and the officers, directors, officials, representatives, agents and employees of all of them, of and from all liability, loss, claims, demands, possible causes of action, court costs, attorneys' fees, and other expenses arising from any lawsuit that may otherwise accrue from any loss, damage or injury (including death) to my person or property in any way resulting from, or arising in connection with, or relating to, any sanctioned event, and whether arising while engaged in competition or in practice or preparation therefor, or while upon, entering or departing from said premises, from any cause whatsoever including without limitation the failure of anyone to enforce rules and regulations, failure to make inspections, or the negligence of other persons. I know the risk and danger to myself and property while upon said premises or while participating or assisting in a sanctioned event, and I do so voluntarily and in reliance, not upon the property, equipment, facilities and existing conditions furnished by others, but upon my own judgment and ability, and I thereby assume all risk for loss, damage or injury (including death) to myself and my property from any cause whatsoever and whether or not attributable to the negligence of others....

I hereby certify that the information supplied on this application is true and correct and may be relied upon by the United States Auto Club, Inc. This application and WAIVER AND RELEASE OF LIABILITY AND INDEMNITY AGREEMENT shall be governed and interpreted by the laws of the State of Indiana....

I HAVE READ AND FULLY UNDERSTAND THIS WAIVER AND RELEASE OF LIABILITY AND INDEMNITY AGREEMENT AND I KNOW AND UNDERSTAND THAT MY SIGNATURE ON THE FORM OPERATES AS A COMPLETE RELEASE OF THE UNITED STATES AUTO CLUB, INC., TOGETHER WITH ITS OFFICERS, DIRECTORS, OFFICIALS, REPRESENTATIVES, AGENTS AND EMPLOYEES

FROM ANY AND ALL LIABILITY, IN-CLUDING NEGLIGENCE, AND I FREELY AND WILLINGLY CONSENT TO THIS WAIVER AND RELEASE OF LIABILITY AND INDEMNITY AGREEMENT."

USAC's Exhibit "A", Record at 417.

Although Woodward argues such release is unconscionable and a contract of adhesion, similar releases have been held valid. *LaFrenz v. Lake County Fair Board*, (1977) 172 Ind.App. 389, 360 N.E.2d 605; *Schlessman v. Henson*, (1980) 83 Ill.2d 82, 46 Ill.Dec. 139, 413 N.E.2d 1252; *Morrow v. Auto Championship Racing Association*, (1972) 8 Ill.App.3d 682, 291 N.E.2d 30; *Seymour v. New Bremen Speedway, Inc.*, (1971) 31 Ohio App.2d 141, 287 N.E.2d 111; *Hine v. Dayton Speedway Corp.*, (1969) 20 Ohio App.2d 185, 252 N.E.2d 648. It is true these cases are ones involving personal injuries. Also, the language of the release signed by Woodward appears to cover primarily injuries to person and property. However the release language is very broad in its terms. Further, Woodward does not contend the release does not cover Woodward's claim in this action. Rather, he contends only that the release is unconscionable and unenforceable as a contract of adhesion. Since similar releases required of participants, entrants, and persons involved in automobile racing have been held valid, we must reject Woodward's arguments. Because he has not raised the question of whether the release is broad enough in scope to bar his present action, we need not decide that issue.

For the reasons heretofore stated in this opinion, Woodward was barred from recovery in this action. The judgment, therefore, must be reversed.

The judgment is reversed and this cause is remanded to the trial court with directions to grant USAC's motion for judgment on the evidence and to enter judgment in favor of USAC.

BUCHANAN, C.J., and SHIELDS, J., concur.