D. Ryan CRANE, by David F. CRANE,
his next friend, Plaintiff–Appellee,

v.

INDIANA HIGH SCHOOL ATHLETIC
ASSOCIATION, Defendant–
Appellant.

No. 91–2227.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 12, 1991.

Decided Sept. 23, 1992.

Rehearing and Rehearing En Banc
Denied Dec. 28, 1992.

**1316**

Wildman, Harrold, Allen & Dixon, Chicago, Ill., Blake Chambers, Washington, Ind., for plaintiff-appellee.

Robert M. Baker (argued), Frederick D. Emhardt, Miller, Faires, Hebert, Woddell & Baker, Indianapolis, Ind., for defendant-appellant.

Before POSNER, RIPPLE, and MANION, Circuit Judges.

MANION, Circuit Judge.

The Indiana High School Athletic Association, Inc. ("IHSAA") appeals a district court order permanently enjoining it from declaring Ryan Crane ineligible to play high school athletics. The IHSAA declared Ryan ineligible pursuant to its transfer eligibility rules. Ryan sued the IHSAA alleging that the IHSAA's decision violated the Equal Protection Clause of the Fourteenth Amendment and Indiana state law. The district court found that the IHSAA transfer eligibility rules violated Ryan's equal protection and due process rights. Although for different reasons, we affirm the decision of the district court.

### I. Background

The facts in this case are not in dispute. Defendant-appellant Indiana High School Athletic Association, Inc. is a voluntary association formed in 1903 which administers a program of high school interscholastic athletics in Indiana. Membership in the IHSAA is open to any public or private, secondary school which is accredited by the Indiana Department of Education and pays the annual membership fee of $1.50. Currently, 410 schools are members of the IHSAA; approximately 80% of those members are public schools. With an annual budget of over $3 million, derived from television contracts, corporate sponsorship, gate receipts and the sale of novelty items, the IHSAA currently administers nine sports for boys and nine sports for girls. The IHSAA has promulgated rules governing when high school athletic teams can practice and play, rules governing each sport and, most important for this case, rules governing the eligibility of high

James A. Kornblum, Lockyear & Kornblum, Evansville, Ind., Ruth E. VanDemark, Raymond E. Beckering, III (argued),

school students to participate in athletics. Continuing membership in the IHSAA is contingent upon strict adherence to these and other rules and regulations promulgated by the IHSAA.

Plaintiff-appellee Ryan Crane is a high school student whose parents were divorced in 1978. The divorce decree gave Ryan's father, David F. Crane, physical custody of Ryan (and his older brother, Chad), subject to his mother's visitation rights. In 1980, custody of Ryan, then five years old, was transferred to his mother. Mr. Crane, pursuant to a court order, paid child support. Ryan lived with his mother, Linda Crane–Gaskill, in Fort Wayne, Indiana until June 1990. During the 1989/90 school year, his freshman year, Ryan attended Fort Wayne Snider High School and was a member of the junior-varsity golf team. In 1989, Ryan's mother, citing "disciplinary problems" and falling grades in school, asked Mr. Crane to take custody of Ryan. At that time, Ryan's parents decided that it would not be a good idea for Ryan to change schools in the middle of the school year. So, Ryan stayed with his mother and finished his freshman year at Snider. After completion of the school year, however, Ryan's parents decided that it was in Ryan's best interests to live with his father. Accordingly, in June 1990, Ryan moved to his father's home in Washington, Indiana. On July 19, 1990, the Circuit Court of Daviess County, Indiana entered an order terminating Mr. Crane's obligation to pay child support.[1]

When Ryan Crane moved to his father's home in Washington, Indiana, he enrolled in Washington High School ("WHS"), a member of the IHSAA, and joined the varsity golf team. As a transfer student, un-der the IHSAA eligibility rules, Ryan was ineligible to participate in athletics for one year unless declared eligible by the IHSAA. The IHSAA will not declare a transfer student eligible for athletics if the transfer was athletically motivated. As required by the IHSAA transfer eligibility rules, the principal of Fort Wayne Snider High School and the principal of WHS filled out an "Athletic Transfer Report" and submitted it to the IHSAA. In this report, both principals recommended that the IHSAA declare Ryan eligible for all interschool athletics, finding that there was no evidence that Ryan transferred to WHS for athletic reasons.

IHSAA Assistant Commissioner Ray Craft rejected these recommendations and declared Ryan ineligible for varsity athletics. Instead, Commissioner Craft declared Ryan eligible only for junior-varsity athletics. This "limited eligibility" was useless to Ryan, however, because he played only golf and WHS did not have a junior-varsity golf team. Thus, Commissioner Craft's decision meant that Ryan could not play golf at WHS. Accordingly, pursuant to IHSAA rules, Ryan appealed Commissioner Craft's decision to the IHSAA Executive Committee. After a short hearing, the Executive Committee summarily affirmed Commissioner Craft's decision. The IHSAA never found that Ryan's transfer to WHS was athletically motivated.

Ryan then filed suit against the IHSAA in the Circuit Court of Daviess County, Indiana, alleging that the IHSAA's decision violated the Equal Protection Clause of the Fourteenth Amendment and Indiana state law. The IHSAA removed the action to the United States District Court for the Southern District of Indiana.[2] The district court

---

1. At oral argument, Ryan's attorney represented that the change of custody was made pursuant to a court order. However, other than the order terminating child support, there is no order (or any other evidence of court approval) in the record.

2. One would think that the IHSAA would prefer to have this case heard in Indiana state court and decided on narrow, state law grounds. After examining the IHSAA's history in Indiana state courts, however, it is apparent why the IHSAA chose the federal forum. IHSAA rules limiting the right of high school students to participate in athletics have not fared well in Indiana state courts. See, e.g., Sturrup v. Mahan, 261 Ind. 463, 305 N.E.2d 877 (1974) (IHSAA rule declaring high school students ineligible to participate in athletics if they transfer schools without a change of residence by the students' parents violates equal protection); Haas v. South Bend Community School Corp., 259 Ind. 515, 289 N.E.2d 495 (1972) (IHSAA rule prohibiting participation of females in male athletic contests violates equal protection if there is

found that the IHSAA's application of the transfer eligibility rules violated Ryan's equal protection and due process rights, and entered a permanent injunction prohibiting the IHSAA "from declaring Ryan Crane ineligible to play high school athletics at Washington High School, Washington, Indiana, based on his move from his mother's home in Fort Wayne, Indiana to this father's home in Washington, Indiana." The IHSAA appeals. Although for reasons different from those offered by the district court, we affirm.

## II. Jurisdiction

■ The IHSAA declared Ryan ineligible to play varsity sports for one year. Ryan has now completed the 11th grade; the one year is over; and therefore, the district court's injunction has run its course. The first question before us, then, is whether this case is moot. Under Article III of the Constitution, our jurisdiction extends only to actual cases and controversies. U.S. Const. art. III, § 2; *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 546, 96 S.Ct. 2791, 2796, 49 L.Ed.2d 683 (1976). We have no power to adjudicate disputes which are moot. The test for mootness "is whether the relief sought would, if granted, make a difference to the legal interests of the parties (as distinct from their psyches, which might remain deeply engaged with the merits of the litigation)." *Air Line Pilots Ass'n International v. UAL Corp.*, 897 F.2d 1394, 1396 (7th Cir.1990).

Generally, after an injunction has expired under its own terms, the underlying dispute is no longer "a present, live controversy." *Henco, Inc. v. Brown*, 904 F.2d 11, 13 (7th Cir.1990) (citation omitted). The injunction in this case has expired. However, there is still a justiciable controversy because of IHSAA Rule 17–6.[3] Rule 17–6 allows the IHSAA to impose retroactive penalties on student athletes (and their schools) who are declared ineligible by the IHSAA but are permitted to participate in interschool competition in accordance with a court restraining order or injunction. If the injunction is subsequently vacated, stayed or reversed, the IHSAA may strike individual and team records, require forfeit of victories won by the team, or require return of individual and team awards earned while the student participated. In this case, while Ryan was playing golf pursuant to the district court's injunction, Ryan placed second individually and WHS was the first-place team in the IHSAA sectional golf tournament. Ryan received an award for his second-place finish, he and his teammates received first-place team ribbons, and WHS received a sectional championship trophy. Under Rule 17–6, if we reverse the district court, the IHSAA intends to seek the return of these awards and require WHS to forfeit its sectional golf championship. The championship trophy would then be given to Washington Catholic High School. Thus, the IHSAA still has a very real, legal interest in the

---

no female athletic program); *Indiana High School Athletic Ass'n v. Raike*, 164 Ind.App. 169, 329 N.E.2d 66 (1975) (IHSAA rule prohibiting married high school students from participating in interschool athletics violates equal protection).

**3.** IHSAA Rule 17–6 states as follows:

If a student is ineligible according to Association Rules but is permitted to participate in interschool competition contrary to Association Rules but in accordance with the terms of a court restraining order or injunction against the student's school and/or the Association and the injunction is subsequently voluntarily vacated, stayed, reversed or it is finally determined by the courts that injunctive relief is not or was not justified, the Committee may, in the absence of court prohibition to the contrary, and after giving notice and an opportunity to be heard to the party or parties

affected, take any of the following action(s) against such school in the interest of restitution and fairness to competing schools:

a. Require individual or team records and performances achieved during participation by such ineligible student be vacated or stricken, and/or

b. Require team victories be forfeited to opponents, and/or

c. Require team or individual awards earned be returned to the Association, and/or

d. If the school has received or would receive any funds from an Association tournament series in which the ineligible individual has participated, require the school forfeit its share of net receipts from such competition, and if said receipts have not been distributed, authorize the withholding of such receipts by the Association.

outcome of this appeal which satisfies the requirements of Article III. *See Wiley v. National Collegiate Athletic Ass'n,* 612 F.2d 473, 475–76 (10th Cir.1979), *cert. denied,* 446 U.S. 943, 100 S.Ct. 2168, 64 L.Ed.2d 798 (1980) (substantial controversy still existed although athlete had graduated because of a similar NCAA rule).

There is yet another reason why we have jurisdiction to decide this appeal—the "capable of repetition yet evading review" exception to mootness. Even when an injunction has expired, we still have jurisdiction "if the underlying dispute between the parties is one 'capable of repetition yet evading review.'" *Nebraska Press Ass'n,* 427 U.S. at 546, 96 S.Ct. at 2796. A dispute is "capable of repetition yet evading review" if: "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subject to the same action again." *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975). Both of these requirements are met in this case. First, the period of ineligibility and thus the district court's injunction could last only one year. One year is not enough time for the validity of the injunction to be fully litigated. The second requirement is met because Ryan is still subject to the IHSAA transfer eligibility rules and the IHSAA could declare Ryan ineligible for varsity athletics again. Ryan will start his senior year at Washington High School in September 1992. His parents are still divorced, and his mother still lives in Fort Wayne, Indiana. If Ryan should move back to his mother's home at any time during the next year, the IHSAA would again declare Ryan ineligible. Thus, under the "capable of repetition yet evading review" doctrine, this case is not moot until Ryan graduates from high school.

### III.  State Law Claim

Ryan's complaint alleges that the IHSAA violated Indiana law by acting in an arbitrary and capricious manner and not in accordance with its own rules. Inexplica-

bly, the district court did not rule on Ryan's pendent state law claim, choosing instead to declare the IHSAA transfer eligibility rules unconstitutional. When a party raises both a pendent state law claim and a federal constitutional claim, "it is ordinarily preferable to decide the pendent state claim first if by doing so the court can avoid a constitutional question." *Argento v. Village of Melrose Park,* 838 F.2d 1483, 1491 (7th Cir.1988). If an action can be resolved on state law grounds, federal courts should do so and should not reach the federal constitutional issues. *See Schmidt v. Oakland Unified School District,* 457 U.S. 594, 595, 102 S.Ct. 2612, 2612, 73 L.Ed.2d 245 (1982) (reaching constitutional issue without resolving state law claim was, under the circumstances, an abuse of discretion). The district court should have resolved Ryan's state law claim before declaring the transfer eligibility rules unconstitutional.

This error, however, can be corrected on appeal. This court may affirm the district court's judgment "on any ground that is supported by the record and has not been waived by the appellee." *LaSalle National Bank v. General Mills Restaurant Group, Inc.,* 854 F.2d 1050, 1052 (7th Cir.1988); *see also United States v. Thomas,* 934 F.2d 840, 843 (7th Cir.1991); *Phillips v. Lane,* 787 F.2d 208, 214 (7th Cir.), *cert. denied,* 479 U.S. 873, 107 S.Ct. 249, 93 L.Ed.2d 173 (1986). Ryan has not waived his state law claim. The state law claim was raised in Ryan's complaint and tried to the district court. On appeal, Ryan has asked us to affirm on state law grounds, and the parties have fully briefed the issue. Accordingly, we will examine whether the IHSAA's actions violated state law.

### A.  Voluntary Associations

A threshold question posed by Indiana law is whether the IHSAA's eligibility determinations are judicially reviewable at all. The IHSAA is a voluntary association. Under Indiana law, as in most states, there is a longstanding, general principle of judicial noninterference in the internal affairs of voluntary associations.

*Indiana ex rel. Givens v. Superior Court of Marion County*, 233 Ind. 235, 117 N.E.2d 553, 555 (1954); *United States Auto Club, Inc. v. Woodward*, 460 N.E.2d 1255, 1260 (Ind.App.1984); *Terrell v. Palomino Horse Breeders of America*, 414 N.E.2d 332, 335 (Ind.App.1980). "A voluntary association may, without direction or interference by the courts, for its government, adopt a constitution, by-laws, rules and regulations which will control as to all questions of discipline, or internal policy and management, and its right to interpret and administer the same is as sacred as the right to make them." *Givens*, 117 N.E.2d at 555.

Exceptions, however, virtually consume this general rule. Indiana courts will intervene when a voluntary association violates a member's property or civil rights. *Woodward*, 460 N.E.2d at 1260. Indiana courts will also act to ensure that voluntary associations do not exercise their power to make and enforce rules in an unlawful, arbitrary or malicious manner. *Woodward*, 460 N.E.2d at 1260–61; *see also Randolph v. Leeman*, 129 Ind.App. 134, 146 N.E.2d 267, 273 (1957) (en banc) ("The decisions of the tribunals of an association with respect to its internal affairs will, in the absence of mistake, fraud, collusion, or arbitrariness, be accepted by the courts as conclusive.") (citation omitted). Finally, voluntary associations must comply with their own rules. *Terrell*, 414 N.E.2d at 335; *Randolph*, 146 N.E.2d at 273.

█ Ryan's complaint alleges that the IHSAA's decision to declare him ineligible for varsity athletics "[w]as arbitrary and capricious and not in accordance with defendant's rules and by-laws." The Indiana Supreme Court has explicitly held that the actions of the IHSAA are judicially reviewable. *Haas v. South Bend Comm. School Corp.*, 259 Ind. 515, 289 N.E.2d 495, 497 (1972) (overruling *Indiana ex rel. Indiana High School Athletic Ass'n v. Lawrence Circuit Court*, 240 Ind. 114, 162 N.E.2d 250 (1959)). More specifically, at least one Indiana court has reviewed an IHSAA decision declaring a transfer student ineligible for athletics to determine if "the IHSAA failed to follow its own rules and acted arbitrarily and capriciously." *Kriss v. Brown*, 180 Ind.App. 594, 390 N.E.2d 193, 200 (1979). Thus, we must also so review the IHSAA's decision in this case. To do this, it is necessary to first describe in some detail the IHSAA transfer eligibility rules.

### B. The IHSAA Transfer Eligibility Rules

At center stage in this dispute is IHSAA Rule 19, governing transfer eligibility, which is designed to prevent high school students from changing schools for athletic reasons. Under Rule 19, all students who change schools are ineligible to participate in interschool athletics for one year unless the IHSAA declares them eligible pursuant to one of the subsections of the rule. The IHSAA will not grant eligibility to students who transfer to a new school "for primarily athletic reasons" or as a result of "undue influence."[4] A transfer "for primarily athletic reasons" includes transferring to take advantage of a superior athletic team, facility or coach and transferring to avoid punitive action taken by the previous school.[5]

---

4. IHSAA Rule 19–4 states as follows:
   To preserve the integrity of interschool athletics and to prevent or minimize recruiting, proselytizing and school 'jumping' for athletic reasons, regardless of the circumstances, student athletes who transfer from one school to a new school for primarily athletic reasons or as a result of undue influence will become ineligible to participate in interschool athletics in the new school for a period not to exceed 365 days from the date the student enrolls at the new school....

5. The definitions section of IHSAA Rule 19 defines a "transfer for primarily athletic reasons" as follows:

A transfer for primarily athletic reasons includes, but is not limited to:
   a. A transfer to obtain the athletic advantage of a superior, or inferior, athletic team, a superior athletic facility or a superior coach or coaching staff;
   b. A transfer to obtain relief from a conflict with the philosophy or action of an administrator, teacher or coach relative to athletics;
   c. A transfer seeking a team consistent with the student's athletic abilities;
   d. A transfer to obtain a means to nullify punitive action taken by the previous school.

"Undue influence" includes any efforts by a school to recruit a student.[6]

There are two subsections of Rule 19 under which the IHSAA may declare a transferring student eligible for interschool athletics. Rule 19–5, which applies to students who transfer with a corresponding change of residence by their custodial parents or guardians, provides that such students may be declared eligible if (a) the change of residence was bona fide; (b) there is no evidence that the transfer was for primarily athletic reasons; and (c) there is no evidence that the transfer was a result of undue influence. A "bona fide" change of residence is one in which the student's original residence is abandoned as a residence and the change is made by all members of the student's immediate family, with the household goods and furniture. A change of residence is not "bona fide" if a single family unit has two or more residences.[7] Ryan could not be declared eligible under this rule because there was no change of residence by either of his parents.

Rule 19–6 governs transfer students who, like Ryan, move from one parent's home to the other's. Rule 19–6.1, which allows a student to be declared immediately eligible for all interschool athletics states, in relevant part:

A student who transfers without a corresponding change of residence to a new district or territory by the student's parent(s)/guardian(s) may be declared immediately eligible provided:

    a. There is no evidence that the transfer was for primarily athletic reasons;

    b. There is no evidence that the transfer was the result of undue influence in violation of Rule C–20; and

    c. There has been provided to the Association reliable, credible and probative evidence that one or more of the following criteria has been met: ...

(2) The student transfers with a corresponding change of residence by the student into a new district or territory to reside with a parent with legal custody which is a result of:

    (i) an event(s) outside the control of the student, or

    (ii) a change(s) in the student's home status, not within the student's control. Moves between divorced or separated parents may meet this criteria, however, multiple moves between such parents will not be approved unless the event(s) or change(s) are significant, substantial and/or compelling....

The IHSAA transfer eligibility rules do not define the terms "event," "outside the con-

6. IHSAA Rule 20 contains the following, non-inclusive list of inducements which constitute "undue influence":
    a. Offer or acceptance of money or other valuable consideration.
    b. Reduction or remission of regular tuition.
    c. Waiving the legal requirements of transfers.
    d. Offer or acceptance of board, room or clothing.
    e. Offer or acceptance of remuneration for work in excess of amount regularly paid for such service.
    f. Free transportation.
    g. Transportation by coach, principal, teacher or school official.
    h. Offer or acceptance of school privileges or considerations not granted other students.
    i. Offer or acceptance of residence with coach, principal, teacher or school official.
    j. Free rent or reduced rent for parents.
    k. Offer or payment of moving expenses of parents.

    l. Any inducement to get parents or student to enroll in a particular school or to induce parents to change residence for athletic reasons.

7. The definitions section of IHSAA Rule 19 defines a "bona fide change of residence" as follows:
[D]etermination of what constitutes a 'bona fide' change of residence depends upon the facts in each case, however, to be considered, the following facts **must** exist:
    a. The original residence must be abandoned as a residence; that is, sold, rented or disposed or, or in the process of being disposed of as a residence and must not be used as a residence by **any** member of the student's immediate family; and
    b. The student's entire immediate family must make the change and take with them the household goods and furniture appropriate to the circumstances. Under no circumstance can a single family unit have two or more residences for eligibility purposes.
(emphasis in original).

trol of the student," or "a change in the student's home status."

The IHSAA made no explicit findings about whether Ryan's transfer to WHS was for athletic reasons, Rule 19–6.1(a), or the result of undue influence, Rule 19–6.1(b). It did, however, grant Ryan "limited eligibility"—that is, eligibility to participate in junior-varsity, interschool athletics—pursuant to Rule 19–6.2. Under Rule 19–6.2, a student can only be declared to have limited eligibility if there is *no* evidence that the transfer was for primarily athletic reasons or was the result of undue influence.[8] The IHSAA must have concluded, therefore, and the parties do not now dispute, that Ryan's transfer to WHS was not athletically motivated. Thus, the dispute in this case is only about the IHSAA's interpretation and application of Rule 19–6.1(c)(2).

### C. The IHSAA's Application of the Transfer Eligibility Rules

It is obvious from the record that the IHSAA has no consistent interpretation of Rule 19–6.1(c)(2). Certainly, the record is unclear as to how the rule applies to children of divorced parents who move from one parent's home to the other's. The IHSAA, through Assistant Commissioner Craft, had three opportunities (during the IHSAA proceedings, the temporary restraining order hearing and the permanent injunction hearing) to express its interpretation of this rule and its reason for declaring Ryan ineligible under the rule.[9] At each opportunity—literally every time Commissioner Craft discussed Rule 19–

6.1(c)(2)—the interpretation of the rule and the reason why Ryan was not declared eligible under the rule changed.

During the IHSAA proceedings, Commissioner Craft maintained that Ryan did not meet the requirements for full eligibility under section 6.1(c)(2)(i) because his change of residence was not the result of an event outside Ryan's control. At that hearing before the IHSAA Executive Committee, held on April 22, 1991, Commissioner Craft testified that:

> The mother had talked to the father explaining to him that she was experiencing disciplinary problems with Ryan and that he was getting into trouble at school and that his grades were suffering.[10] I would submit to you that I would think that this is something that was in the control of Ryan, not his mother, not the school, but Ryan.

(IHSAA Tr. at 9–10) At the hearing, and throughout the proceedings in the district court, Ryan's father testified that Ryan had no control over who would have custody of him. (IHSAA Tr. at 39) The decision to move Ryan to his father's home was made by Ryan's parents based on their belief that such a move was in Ryan's best interest. (IHSAA Tr. at 37) Commissioner Craft seemed to concede this point stating that Ryan's move "was strictly agreed to by both parents that it was in his best interest that the change be made.... The parents agreed that this was what should happen." (IHSAA Tr. at 11) Yet, in an apparent attempt to justify the denial of full eligibility under § 19–6.1(c)(2)(i), he still

---

**8.** IHSAA Rule 19–6.2 states:
   A student who transfers without a corresponding change of residence to a new district or territory by the student's parent(s)/guardian(s) may be declared to have limited eligibility, provided:
   a. There is no evidence that the transfer was for primarily athletic reasons.
   b. There is no evidence that the transfer was the result of any undue influence in violation of Rule C–20.

**9.** There have been three evidentiary hearings in this case. The first was before the IHSAA Executive Committee; citations to the transcript of this hearing appear as "IHSAA Tr." The second was the temporary restraining order hearing in

the district court; citations to the transcript of this hearing appear as "TRO Tr." The third was the district court hearing on the merits; citations to the transcript of this hearing appear as "PI Tr."

**10.** Ryan's father testified at the hearing that Ryan was a "typical teenager" and the "disciplinary problems" were not "anything that bad." (IHSAA Tr. at 32) Before the district court, Ryan's father represented that Ryan had not been in trouble with the police. (PI Tr. Vol. II at 256–57) Beyond this, there is no indication in the record (and the IHSAA does not seem to know) what Ryan's "disciplinary problems" were.

concluded that the "change" was within Ryan's control.

Commissioner Craft's explanation in this hearing of why Ryan did not meet the requirements of section 6.1(c)(2)(ii)—"a change in the student's home status, not within the student's control"—was sketchy at best. Commissioner Craft stated only that:

> The second part of our rule about change between divorced and separated parents is the fact that they have residence in the school district of the parent with legal custody, but there must be a change in the home status beyond the control of the student and his parents that make this change necessary.... there is no documentation that I have that shows there was a change in the status of the home anywhere that made this move necessary.

(IHSAA Tr. at 10–11) Commissioner Craft did not, at this time, define "a change in home status." Thus, his testimony is not very illuminating. This testimony does show, however, that even at this point, Commissioner Craft was attempting to mold the language of Rule 19–6.1(c)(2)(ii) to fit the Crane family's situation. The plain language of the rule requires a change in home status "not within the student's control." Here, Commissioner Craft contends that the change in home status "must be ... beyond the control of the student *and his parents*."

Commissioner Craft's testimony at the temporary restraining order hearing in the district court, held on April 26, 1991, just four days later, is perplexing, to say the least, and best demonstrates the IHSAA's confusion about Rule 19–6.1(c)(2). Commissioner Craft began his testimony by abandoning his prior statement that Ryan was ineligible to play varsity athletics because his change of residence was not outside of his control and focusing instead only on the "change in home status" requirement of section 6.1(c)(2)(ii):

> "Now, I realize that it wasn't in control of the student athlete, but the information that I based my decision on was that there was no change in the student's home status of his mother."

(TRO Tr. at 32) In response to a question by the district court, Commissioner Craft defined a "change in home status" as:

> ... something that happened in the home and not within the control of the parent. It could be a financial situation. It could be moving out of state. It could be many, many different reasons that the home status changed and the student must move from one parent to the other....

(TRO Tr. at 33) Commissioner Craft stated that a unilateral decision by the parents to change custody is not one of those "many, many different reasons."

We should point out that the two above indented quotations evidence another departure from the plain language of the rule. Section 6.1(c)(2)(ii) requires "a change in the *student's* home status, not within the *student's* control." But, Commissioner Craft testified that there had to be a change in the "home status of *his mother*" which was "not within the control of *the parent.*" Thus, having given up on Ryan's lack of control over his behavior, Commissioner Craft changed the focus of the rule to Ryan's parents. Commissioner Craft later completed his 180–degree turn by stating that discipline had nothing to do with his decision (TRO Tr. at 34) and, in direct contradiction to his testimony in the IHSAA hearing, that he "didn't determine that Ryan had any [control over the decision to move]. I just determined that there wasn't a change in the status of the home." (TRO Tr. at 35–36)

But Commissioner Craft did not stand by this position for long either. As the hearing continued, his story changed again. After the district court and Ryan's counsel pointed out that section 6.1(c)(2)(i) requires only an "event outside the control of the student" and not a change in home status, Commissioner Craft stated, turning back 180 degrees, that Ryan did not meet the requirements of section 6.1(c)(2)(i) because "his disciplinary problem, his grades ... was [sic] in his control," and he did not meet the requirements of section 6.1(c)(2)(ii)

because "there was no change in home status." (TRO Tr. at 36) Shortly thereafter, however, Craft conceded once again that the decision by Ryan's parents to move Ryan to his father's home was outside of Ryan's control:

> MR. CRAFT: ... he may not have chosen to go and that was the parents' decision and that was outside of his control.
>
> MR. CHAMBERS: You concede that?
>
> MR. CRAFT: Certainly.

(TRO Tr. at 37–38)

By the permanent injunction hearing, held on May 20, 1991, a month later, Commissioner Craft, at least, put forth only one interpretation of Rule 19–6.1(c)(2). However, this interpretation was, once again, somewhat different from anything that had come before. Commissioner Craft stated that Ryan did not meet the requirements of section 6.1(c)(2)(i) because there was no "event" outside Ryan's control. He defined an "event" as something that disrupted Ryan's prior school setting, like a tornado or a racial problem. (PI Tr. Vol. II at 150, 153–54) A decision by Ryan's parents to change custody is not an "event," Commissioner Craft testified, it is a "decision." *Id.*

Commissioner Craft again stated that Ryan did not meet the requirements of section 6.1(c)(2)(ii) because there was no "change in home status." Like the word "event," Craft defined the phrase "change in home status" as some type of catastrophic occurrence that happened in the home:

> [I]t might be a financial thing that happened that, you know, the mother can no longer afford. That changed the student's home status because there's no money to afford to keep the student athlete anymore so they sent him to the father. She may have an illness. She may move out of State. So there's a change in his home status, so that makes it necessary or which would be a reason that he could have immediate eligibility with his father in another school district.

(PI Tr. Vol. II at 152) Since his mother was solvent and healthy and his prior school

had not been destroyed by a tornado, Ryan could not be declared eligible to play varsity athletics under Rule 19–6.1.

At this point, once again, Commissioner Craft's reasoning had nothing to do with Ryan's "disciplinary problems." He stated, in fact, that Ryan would still be ineligible even if there had been no disciplinary problem. (PI Tr. Vol. II at 161) This directly contradicts Craft's statements in the IHSAA proceedings. There, the only reason Commissioner Craft articulated for declaring Ryan ineligible was that Ryan's disciplinary problems were "in the control of Ryan, not his mother, not the school, but Ryan." (IHSAA Tr. at 10) By the permanent injunction hearing, Ryan's control or lack of control over himself was irrelevant. In fact, by this final hearing, Commissioner Craft claimed that the words "not within the student's control" had little to do with his decision. (PI Tr. Vol. II at 152)

The IHSAA does not attempt to explain Commissioner Craft's flip-flopping testimony. Rather, it attempts to separate itself from that testimony by pointing out that the IHSAA Executive Committee, not Commissioner Craft, made the final decision on Ryan's eligibility. Thus, the IHSAA argues, we should only consider the Executive Committee's "written decision." This argument is a smoke screen because the Executive Committee summarily affirmed Commissioner Craft's decision without explanation. There is no written opinion by the Executive Committee for us to review. In contrast, Commissioner Craft explained the decision to declare Ryan ineligible three times—and the IHSAA never disagreed with his testimony. If it did, some other IHSAA official could have so testified in the district court. The IHSAA never disagreed with Commissioner Craft's testimony and thus cannot now hide behind the Executive Committee's failure to explain its ruling. Commissioner Craft's testimony is all we have to go on. But, Commissioner Craft is the IHSAA's admitted "guru" on transfer eligibility. (TRO Tr. at 26) He rules on all the transfer eligibility cases, as many as 80 per day. (PI Tr. Vol I at 120; PI Tr. Vol II at 131) Although a student

who runs afoul of Commissioner Craft may appeal to the Executive Committee, only about 5% of Craft's decisions are overturned. (PI Tr. Vol. I at 120) We must judge the IHSAA's decision based on Commissioner Craft's testimony.

From the above recitation of Craft's testimony, it should be clear why we find that the IHSAA acted arbitrarily and capriciously. As a voluntary association, the IHSAA has the power to promulgate rules without interference by the courts, and its right to interpret those rules "is as sacred as the right to make them." *Givens*, 117 N.E.2d at 555. If IHSAA Rule 19–6.1 was unambiguous or if the IHSAA interpreted and applied the rule consistently, no court could interfere. What the IHSAA cannot do is apply its rules in an arbitrary manner. *Woodward*, 460 N.E.2d at 1260–61; *Randolph*, 146 N.E.2d at 273. And when the IHSAA acts arbitrarily, as it has here, Indiana law tells us we must intervene.

The IHSAA's problem starts with a poorly drafted rule. Although the rule includes definitions and examples of key phrases such as "transfer for primarily athletic reasons," "bona fide change in residence," and "undue influence," other important terms—namely, "event," "outside the control of the student," and "a change in the student's home status"—are left conspicuously undefined. This omission would not be fatal if the IHSAA used the common meaning of these terms or interpreted the terms consistently. But it does not. As Commissioner Craft's testimony demonstrates, the IHSAA has no consistent idea what these words mean. As bluntly stated by Mr. Crane: "Quite honestly I haven't found anybody in this courtroom that understands these rules. I think that's the problem." (PI Tr. Vol II at 262)

The IHSAA's interpretation of Rule 19–6.1(c)(2) seems to change with the situation at hand. It appears that the IHSAA is attempting to find definitions for those phrases that will allow it to declare Ryan, and others like him, ineligible—regardless of whether his transfer was athletically motivated. The IHSAA uses rambling rationalizations to construct definitions that will lead to (what appears to be) a preordained result, ignoring all else. Evidence of this arbitrariness is the IHSAA's complete disregard of the second sentence in section 6.1(c)(2)(ii): "Moves between divorced or separated parents may meet this criteria, however, multiple moves between such parents will not be approved unless the event(s) or change(s) are significant, substantial and/or compelling." This sentence is the only written, objective indication of how this section should be interpreted. And since this is not a case of "multiple moves," it is hard to imagine why Ryan was not declared eligible pursuant to this part of the rule. When asked why he did not apply this part of the rule, Commissioner Craft had no answer.

The IHSAA's inconsistency is aggravated by the fact that it does not publish any type of written opinion or reasoning for its eligibility decisions to member schools. Thus, there is no guidance for high schools, students or parents; and as evidenced by Mr. Crane's testimony, divorced parents cannot make fully informed decisions about the welfare of their children:

> And I guess one thing I'm really kicking myself around about, all of a sudden it looks like that I really made a bad call in not letting him transfer down in the middle of the school year in '89. You know, if he would have, I guess we wouldn't be sitting here today. And at the same time I don't believe that would have been a prudent decision on my part because I really don't believe that was the best thing for any kid to transfer in the middle of a school year from one school to another. But yet on the other hand, because you try to make a right decision, rules that govern a matter can be interpreted so that it turns out in another aspect to be a poor decision. And I think like most cases, the kids end up suffering.

(IHSAA Tr. at 41–42) The IHSAA needs to decide what Rule 19–6.1(c)(2) means and how it applies to children of divorced parents who move from one parent's home to the other's. Once the IHSAA decides on one interpretation, it should publicize that interpretation and apply it consistently.

The IHSAA's *ad hoc* interpretation and application of Rule 19–6.1 in this case was arbitrary and capricious in violation of Indiana law. Because we find that the IHSAA's interpretation and application of the transfer eligibility rules was arbitrary, we do not reach the question of whether the rules run afoul of equal protection or due process and express no opinion on these issues.

## IV. Equitable Relief

The IHSAA's final argument on appeal is that the district court erred in granting Ryan equitable relief. By the time the district court entered the permanent injunction, the WHS varsity golf team had only one tournament left to play, the IHSAA State Golf Tournament. Not being allowed to play in this tournament, the IHSAA contends, is not a sufficient injury to justify a permanent injunction. Our review of the district court's decision to grant a permanent injunction "is limited to the determination of whether the district court abused its discretion in deciding that the circumstances of the case justified injunctive relief." *Prohosky v. Prudential Ins. Co. of America*, 767 F.2d 387, 391 (7th Cir.1985) (citation omitted).

■ To justify entry of a permanent injunction, Ryan had to prove that he had no adequate legal remedy. *Walgreen Co. v. Sara Creek Property Co.*, 966 F.2d 273, 274 (7th Cir.1992); 11 C. Wright & A. Miller, *Federal Practice & Procedure* § 2944 at 392 (1973). He was not required, however, to show irreparable injury. *Walgreen Co.*, 966 F.2d at 275. Although it is a necessary element for a temporary restraining order or a preliminary injunction, " 'irreparable injury is not an independent requirement for obtaining a permanent injunction; it is only one basis for showing the inadequacy of the legal remedy.' " *Jennings Water, Inc. v. City of North Vernon*, 895 F.2d 311, 318 n. 6 (7th Cir. 1989) (quoting Wright & Miller § 2944 at 401). Ryan could also show the inadequacy of the legal remedy "by demonstrating that damages would not adequately compensate him." 11 Wright & Miller § 2944 at 398.

■ And this is what he did. Ryan called as a witness a golf pro who testified that a state golf tournament is a unique experience important to the competitive development of a young golfer. He also called a psychologist who testified that participation in competitive high school athletics had emotional and psychological benefits that could not easily be quantified. The district court was free to accept this testimony and did not abuse its discretion by concluding that the testimony showed the inadequacy of the legal remedy. Based on the testimony presented, the district court's conclusion that money damages could not adequately compensate Ryan for the lost opportunity to compete in the state golf tournament is well-founded.

## V.

For the foregoing reasons, the judgment of the district court is AFFIRMED.

POSNER, Circuit Judge, dissenting.

My colleagues on this panel have decided to bypass the constitutional issues and place decision on a state-law ground presented as a pendent claim but not resolved by the district judge: the Indiana High School Athletic Association acted arbitrarily and capriciously in denying Ryan Crane eligibility to play varsity golf. If the constitutional issues were substantial I would be happy to duck them. They are not; neither for that matter is the issue of state law.

In our sports-obsessed society, high school students (with or without parental connivance) will sometimes try to change schools in order to have a better chance of playing on a varsity team. The Indiana High School Athletic Association (composed primarily of public schools—so its actions, I agree, are state action, *NCAA v. Tarkanian*, 488 U.S. 179, 193 n. 13, 109 S.Ct. 454, 463 n. 13, 102 L.Ed.2d 469 (1988); *Griffin High School v. Illinois High School Association*, 822 F.2d 671, 674 (7th Cir.1987)) has therefore found it necessary to forbid a student who transfers to a new school district without a corresponding change of

residence by his parent or guardian to play on the varsity team in the new school district unless he presents "reliable, credible, and probative evidence" that the transfer was due to "an event(s) outside the control of the student" or "a change(s) in the student's home status, not within the student's control." Ryan Crane's parents are divorced. He used to live with his mother, but because "she was experiencing disciplinary problems with [him] and ... he was getting into trouble at school and ... his grades were suffering" his parents decided he should move in with his father—who lived in a different school district. An assistant commissioner of the Association ruled that Ryan, having failed to present "reliable, credible, and probative evidence" that the transfer had occurred for reasons beyond his control, could not play varsity golf for his new school. The Association's executive committee affirmed the ruling.

The district judge held that the Association's decision unreasonably burdened the right of Ryan's parents to make decisions concerning the welfare of their family. The judge did not make clear what class he thought was being discriminated against— indeed though he used the term equal protection his opinion is more readily understood in terms of substantive due process— but the plaintiff has tried to correct his oversight by specifying as the class discriminated against children whose parents are divorced. I do not see how the rule can be thought to bear more heavily on divorced than on married parents. A student whose parents were divorced and lived in different school districts would have a better shot at being able to switch between those districts than one whose parents were married and lived with each other and with him, obviously in a single district. The Association merely doesn't want to give the child of two households a free shot; that would have the perverse effect of discriminating against the children of married persons.

Even if the rule or, more plausibly, its application in this case could be thought to bespeak insensitivity to the problems of children of divorced parents, I should not think the Constitution involved. Although that august document is singularly bereft of references to family, I accept that the states no longer enjoy a free hand in the area of marriage, reproduction, the family, and sex. After cases like *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), and *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), *Moore v. City of East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977), and *Zablocki v. Redhail,* 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978), I assume that a state could not forbid divorce *tout court,* or limit married couples to two children, or forbid such couples to have sexual intercourse more than twice a month, or, coming a bit closer to the present case, require parents to live apart, or to send their children to boarding school. Such regulations would be held to violate equal protection or due process or both. *Niehus v. Liberio,* 973 F.2d 526, 538 (7th Cir.1992) (dictum). But that is far from saying that every state rule—more, every interpretation, every application, of every such rule—that could be thought to interfere with the family, or rather with a particular family, is subject to fish-eyed scrutiny by federal judges applying a vague norm of reasonableness. That would draw the whole of family law—not to mention large parts of other law, including the law of voluntary associations, even, if one can speak so, of the "law" of varsity eligibility in Indiana—into the federal courts. A public employer that granted spousal benefits to its employees would be in constitutional hot water because the employer would be discriminating against divorced persons. Every award of custody would raise a constitutional issue—whereas in fact the states are assumed to be competent to resolve custody issues without the oversight of the federal judiciary.

The concerns that I have just expressed led this court in *Hameetman v. City of Chicago,* 776 F.2d 636, 643 (7th Cir.1985)— a decision not cited by the district judge— to rule that "state or local regulations are not unconstitutional deprivations of the right of family association unless they regulate the family directly," as in the hypo-

thetical cases that I gave in the preceding paragraph. The rule of the Indiana High School Association does not regulate the family directly. *Hameetman* involved a residency requirement, and that is the essential character of the rule challenged here. A case even closer to ours is *Niles v. University Interscholastic League,* 715 F.2d 1027 (5th Cir.1983). A league rule required that a student be a resident of the school district for a year before participating in interscholastic sports. The rule was used to prevent a student whose residence had changed as a result of his divorced mother's remarrying from participating in an interscholastic sport. The court rejected the student's claim that this application of the rule infringed his constitutional rights of travel and of family association. See also *Hardy v. University Interscholastic League,* 759 F.2d 1233 (5th Cir.1985).

Even if (as I do not believe) *Hameetman* and *Niles* are wrong, and a state regulation *might* be unconstitutional if it had "the incidental and unintended effect of inducing family members to live apart," *Hameetman v. City of Chicago, supra,* 776 F.2d at 643—more precisely, to make Ryan live with his mother rather than with his father—the plaintiff would have to show that the regulation was irrational, for rational rules that regulate marriage and the family directly are constitutional even if they burden or deter marriage, *Califano v. Jobst,* 434 U.S. 47, 50–54, 98 S.Ct. 95, 97–99, 54 L.Ed.2d 228 (1977), let alone divorce. So Ryan Crane would still lose. The assistant commissioner was not required to accept vague general testimony that Ryan is "difficult," and therefore would be better off living with his father, as a compelling reason to allow him to play varsity golf for his new school. A decision for Ryan would invite strategically motivated transfers thinly disguised as transfers in the best (nonathletic) interest of the student. The temptation would not be limited to the children of divorced parents. Children of high-school age do not always live with their parents. I mentioned boarding school. And some students live with relatives other than their parents. More would do so if high school athletic associations allowed

students who changed school districts even though their parents' residence was unchanged to retain their varsity eligibility. In *Niles* the student moved in with a man who, at the request of the student's mother, had been made his legal guardian. 715 F.2d at 1029.

My colleagues complain that the assistant commissioner and the executive committee did not adequately articulate the reasoning underlying their rulings in Ryan's case. It is easy for us professional judges to score points off our lay counterparts. The Indiana High School Athletic Association may not have realized that it would be held to the adjudicative standards of a federal court. The failure of the executive committee to issue a written opinion can hardly be blamed on the committee. Ryan Crane's father could have requested such an opinion and did not. In light of this failure we should treat the committee's decision as we would a jury verdict (which is a decision not accompanied by an opinion), and uphold it if it is rational. Which it is.

What I have said so far should be enough to show that my colleagues are mistaken to suppose that an Indiana state court would think Ryan Crane had a good claim under Indiana law. He would not even if that law empowered courts to invalidate any ruling by a voluntary association that the courts thought arbitrary and capricious; for the Association's ruling was not that. But that is not the test. *United States Auto Club, Inc. v. Woodward,* 460 N.E.2d 1255, 1260 (Ind.App.1984), explains that the "principle of judicial noninterference in the affairs of voluntary associations" means that "in the absence of fraud, illegality, or violation of a civil or property right, the courts will not interfere with the internal affairs of an association or club." That is, courts will not enforce the internal rules of the association. *State ex rel. Givens v. Superior Court,* 233 Ind. 235, 117 N.E.2d 553 (1954). Hence they will not enforce rights created by those rules, but only civil or political rights having their origin elsewhere. *Terrell v. Palomino Horse Breeders of America,* 414 N.E.2d

332, 335 (Ind.App.1980), creates an exception, dubious in light of *Givens,* for rules requiring due process. Ryan Crane was accorded due process. *Terrell* by the way is the only case cited in the majority opinion in which the decision of an association was invalidated.

If Indiana courts will not enforce an association's internal rules, neither will they second-guess its interpretation and application of its rules, as this court does today. It is true that in *Kriss v. Brown,* 180 Ind.App. 594, 608–09, 390 N.E.2d 193, 202 (1979), the court reviewed a decision of the Indiana High School Athletic Association on eligibility to determine whether the Association had acted arbitrarily and capriciously. But it did not consider whether this was the correct standard. It had no occasion to do so, since it was plain that the decision was *not* arbitrary or capricious, any more than it was here. *Kriss v. Brown* also holds that a student cannot complain of administrative deficiencies for which he shared responsibility either by not objecting or by failing to claim his procedural rights. 180 Ind.App. at 609, 390 N.E.2d at 202, and nn. 5–6. No more should Ryan Crane be allowed to complain about the executive committee's failure to issue an opinion.

I am worried by what this decision may portend for the future. By leaving the district judge's bizarre constitutional ruling undisturbed, by failing to reaffirm *Hameetman* or even cite *Jobst,* and by reaching out to strike down the Association's action on a most tenuous state ground, the decision today may signal a willingness on the part of some members of this court to constitute the court an arbiter of purely local disputes related, however remotely, to family status. I do not relish such a role. I think it carries us well beyond our constitutional mandate.

I would reverse the decision of the district court with instructions to enter judgment for the defendant.